## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VINCENT WALLACE | CIVIL ACTION |
| Plaintiff, | |
| | NO. _____ |
| v. | |
| CITY OF PHILADELPHIA, and DETECTIVE JAMES PITTS, DETECTIVE OHMARR JENKINS, DETECTIVE JACK CUMMINGS, DETECTIVE GILLESPIE, and DETECTIVE JAMES POULOS in their individual capacities | **COMPLAINT** |
| Defendants. | |

Plaintiff, Vincent Wallace, by and through his attorneys, the Marrone Law Firm, LLC, hereby alleges as follows:

## INTRODUCTION

1.     On March 9, 2023, Plaintiff Vincent Wallace had spent more than 14 years in state prison for a crime he did not commit. Wallace's sentence had already been vacated because of illegal activity committed by Detective James Pitts. Now the Philadelphia District Attorney's Office ("DAO") was before the court on its attempt to retry the case. The assigned ADA stated the following on the record:

> As I'm sure you've reviewed the defense's motion to quash, this is a case where **Detective Pitts was heavily involved in the investigation**. The Commonwealth has ultimately come to the determination that without being able to use Detective Pitts, **we would not have enough evidence to survive defense's motion to quash** or even a judgment of acquittal at this stage. This decision has gone through my supervisors, ultimately up to DA Krasner, and the decision has ultimately been made that this will be my motion to nolle pros the case.

*Commonwealth v. Vincent Wallace*, CP-51-CR-15493-2010, March 9, 2023, pp. 4-5 (Emphasis

added). With those words Vincent Wallace finally obtained a favorable outcome of the criminal

proceedings against him for the murder of Ernest "Flash" Miller. According to the court record

cited above, once the tainted material was removed from the case, there was **no evidence** of Mr.

Wallace's involvement. After serving more than fourteen years in prison, Vincent Wallace was

free.

      2.      Mr. Wallace now makes his claims for constitutional violations under the Fourth

and Fourteenth Amendments of the United States Constitution. These claims are based, in part,

on the corrupt and unconstitutional conduct of Detective James Pitts, who has now been

convicted of concealing and fabricating evidence, often through violent means, to obtain arrests

and convictions. The circumstances of the case for which Pitts was convicted, *Commonwealth v.*

*Onyiah*, CP-51-CR-001632-2011, are very similar to those that caused Mr. Wallace's wrongful

conviction. In the present case, Pitts coerced the Commonwealth's star witness Raffinee Taylor

to give false statement and identification of Mr. Wallace. Taylor admitted at trial that she had

been coerced, but she was impeached by the prior statement that had been coerced by Pitts. That

false statement was read back to the jury, even though it was known to be untrue.

      3.      James Pitts did not do this himself. Throughout Pitts' career he has had

supervisors and co-workers who themselves engaged in unconstitutional conduct by enabling

Pitts' rampant form of police corruption. Detectives Ohmarr Jenkins and Jack Cummings are also

defendants in this case because of their role in obtaining false evidence, particularly from

Raffinee Taylor. As in other cases, Jenkins and Cummings assisted Pitts when they should have

been trying to stop him.

## JURISDICTION AND VENUE

4.      This action is brought pursuant to 42 U.S. § 1983 to redress the deprivation under color of law of the Plaintiff's rights as secured by the United States Constitution. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

5.      This Court has supplemental jurisdictions over the plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

6.      Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

## JURY DEMAND

7.      Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

8.      Plaintiff **Vincent Wallace** is, and at all times relevant to this Complaint was, a resident of Pennsylvania. Mr. Wallace was born in 1957. On January 6, 2009, he was wrongfully arrested, and later wrongfully convicted, of the murder of Ernest "Flash" Miller. As a result, Mr. Wallace spent more than fourteen years in prison until evidence of Defendant Pitts' wrongful, illegal and unconstitutional conduct provided a basis for Wallace to have his conviction vacated in 2023, after which the DAO asked the court to *nolle pros* all charges.

9.      Defendant **City of Philadelphia** is, and at all times relevant to this Complaint was, a municipality located in the State of Pennsylvania. The City of Philadelphia was, at all

3

times relevant to this Complaint, officially responsible for the policies, practices and customs of the Philadelphia Police Department (PPD), and was the employer of the individual PPD Defendants in this matter.

10.    Defendant **James Pitts**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Pitts was assigned as a detective with the Homicide Unit at the time of this investigation.

11.    Defendant **Ohmarr Jenkins**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Jenkins was assigned as a detective in the Homicide Unit at the time of this investigation.

12.    Defendant **Jack Cummings**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Cummings was assigned as a detective in the Homicide Unit at the time of this investigation.

13.    Defendant Detective **Gillespie**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Gillespie was assigned as a detective in the PPD at the time of this investigation.

14.     Defendant **James Poulos**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD. He is sued in his individual capacity. Upon information and belief, Poulos was assigned as a detective in the Homicide Unit at the time of this investigation.

15.     Defendants Pitts, Jenkins, Cummings, Gillespie, and Poulos are collectively referred to herein as "Individual Defendants."

16.     At all times relevant to this Complaint, the Individual Defendants named above acted in concert and in conspiracy with one another in order to deprive Mr. Wallace of his constitutionally protected rights.

## FACTUAL ALLEGATIONS

17.     On December 28, 2008, Vincent Wallace was 51 years old. On that day he was planning to go with his mother to visit his father who was in hospice care with terminal illness. At that time, Mr. Wallace was operating a contracting business that served several residential clients. He was a responsible adult with a loving family and a reliable stream of income.

18.     Prior to leaving to go visit his dying father, Mr. Wallace was approached by Kyle Reed, whom Mr. Wallace knew from the neighborhood. Reed informed Mr. Wallace that there was an opportunity for contracting work in North Philadelphia, and Wallace should come with Reed to look at the residence that was allegedly in need of Wallace's services.

19.     Mr. Wallace was reluctant to delay the visit to his father, but Reed assured Wallace that the errand could be completed in less than an hour. As this was an opportunity to help provide for his family, Wallace agreed to go with Kyle Reed.

20.    Reed drove his black Honda Accord with distinctive front-end damage to the location that Wallace was supposed to look at for contractor work. When Reed picked up Wallace, Michael Grant was with him. Wallace did not know Grant well. Grant and Reed sat in the two front seats and Wallace sat in the back for the ride to North Philadelphia.

21.    When the black Honda arrived in the vicinity of 2605 West Oakdale Street, Reed and Grant exited the car and advised Wallace to stay put. Wallace proceeded to wait in the car for long enough to draw the attention of police officers who asked him to move the car away from the corner and younger men who were "hanging out" at the corner of 26th Street and Oakdale Street.

22.    After the police officers left, the young men in question approached Wallace in the car and asked if he wanted to buy drugs. He declined and decided that he had waited long enough. He got out of the car and started to consider taking a bus back home so that he could take his mother to his father's side.

23.    While Wallace was out of the car, planning to leave the neighborhood, he was spotted by Reed who motioned for Wallace to come into the house to have a look around.

24.    When Mr. Wallace entered the home, Reed was right in back of him. Wallace observed a man who would later be identified as former Philadelphia police officer Ernest "Flash" Miller sitting on the stairs to the second floor. Mr. Wallace could also see Michael Grant was sitting in a chair in the living room.

25.    Mr. Wallace proceeded to introduce himself and the services he could potentially provide to the homeowner. Just then Miller and Grant started shooting at each other and Reed ran out. Grant also shot at Wallace who was so shocked, he only had time to cover his face and call out "God!"

26.     When the shooting stopped, Kyle Reed came in, collected the guns from the scene and attempted to rescue Michael Grant. Reed managed to pull Grant out the door but left him there. Reed and Wallace got into the black Honda and left the scene. After driving around for a while, Reed dropped Wallace off at Einstein Hospital.

27.     In the meantime, Philadelphia police had been alerted of the shooting and officers proceeded to the scene investigate.

28.     Upon arriving at 2605 West Oakdale Street police discovered a male who had been shot in the chest, and subsequently died. This male was later identified as Michael Grant. After entering the house, the police discovered a second deceased gunshot victim, subsequently identified as former Philadelphia Police Officer Ernest Miller.

29.     Ballistics observed at the scene confirmed that a shootout had taken place. Further investigation revealed that Mr. Miller owned a registered Glock semi-automatic handgun. Analysis of the ballistics revealed that a Glock type weapon and a revolver were used during the commission of this shootout. No guns were recovered, nor was any DNA material recovered that was associated with anyone other than decedents Miller and Grant.

30.     When police arrived at the scene, they spoke to multiple witnesses. Three of these witnesses, Kiara Cheevez, Emmanuel Walker and Ronald Lee were transported to homicide to provide further information and give formal statements.

31.     Additionally, PO Saverio Haman overheard a witness at the scene, later identified as Duane Tate, describing what he had observed a guy limp from the 2600 block of Oakdale Street, and get into the front passenger seat of a black Honda Accord with front end damage. The car backed up, and both the driver and passenger got out of the car. The male stated that the

passenger collapsed and the driver jumped back into the Honda and pulled off. Tate would testify at the preliminary hearing; however, he passed away prior to trial.

32.     Before the Preliminary Hearing, but after the above information was overheard by PO Haman, Duane Tate gave a statement that contradicted the information obtained by Haman. This discrepancy was concealed from Mr. Wallace and his defense attorney, denying them the opportunity to fully cross-examine Tate at the Preliminary Hearing. This concealment and suppression proved to be more prejudicial when Tate died before trial, where the jury only got to hear the Preliminary Testimony of the now unavailable witness.

33.     Kiara Cheeves was interviewed by Homicide Detectives Fetters and Mangioni. She told the police that she was at the decedent Miller's house earlier in the day, and he walked her to a hair salon. When she returned to his house, the police were there, Michael Grant was still lying in the street, and she attempted to get into the property, because she wanted to collect her things from inside his house. She told the police that she had "shoes and clothes. I have a white and green bag in the living room. I have a white and black jacket inside the closet. I have a pair of tan boots upstairs on the shelf. I have other shoes up there as well.".

34.     Kiara Cheeves' bag was in the living room, her coat was in the closet, and her clothing and shoes were in the decedent's bedroom, and she was on the scene nearly simultaneously as the police, yet she was released and never reinterviewed. Furthermore, based on the Crime Scene Unit analysis, the Crime Scene concluded that based on the trajectory of the bullets fired, someone had been running up the stairs to avoid being shot. (N.T. 11/27/12 at 48 ).

35.     Detectives later determined that Kiara Cheeves was actually a fake name, and all of the biographical information as well as contact information she had provided were also false.

This falsity of her information was never revealed to defense counsel until Detective Jenkins testified regarding Kiara Cheeves at trial. (N.T. 11/28/12 at 132).

36.    Emmanuel Walker was interviewed by Homicide Detectives Jenkins and Pitts. Mr. Walker lived across the street from decedent Miller. He told the police that he heard three gunshots that sounded like firecrackers. He looked out the window and saw a man fall to the ground. He then tried to render aid to this man, who had been shot in the chest. When he did so, he saw decedent Miller standing at the door. Soon after the ambulance arrived. (See attached statement of Emmanuel Walker, Exhibit E). Even though this information would later contradict all aspects of the Commonwealth's theory of the case, Mr. Walker was never requestioned or asked to make any kind of identifications, and he was never called to testify at trial.

37.    Emmanuel Walker also told police his girlfriend was present for what occurred and was with him at the time. Detectives never followed up with an interview of his girlfriend, nor did they even get her name or contact information from Mr. Walker.

38.    After Michael Grant was identified as the other gunshot victim, police located his wife, Michelle Hinds. Ms. Hinds told police that her husband Michael Grant had gone out to make a "run" with Kyle Reed, who she knew as "Kos." Kos later called her, and she met him at Haines and Morton Street, where he told her that "he (Michael Grant) did not make it back from this one." (N.T. 11/25/12 p. 11-112).

39.    Based on the interview with Michelle Hinds, police developed Kyle Reed as a suspect. Based on an old PFA, they discovered Kyle Reed had a girlfriend named Raffinee Taylor. Detective Cummings, who swore out the Search Warrant for Raffinee Taylor's home, came to the conclusion that Kiara Cheeves and Raffinee Taylor were actually the same person.

40.    At trial, Detective Jenkins testified that while police were serving the warrant at Ms. Taylor's home, Ms. Taylor drove by the home, and it was at that point that they realized that Ms. Taylor and the alleged Ms. Cheeves were not the same person. (N.T. 11/28/12, 145) However, neither of the Detectives who actually interacted with Ms. Cheeves, Mangioni or Fetters, were the ones to come to that conclusion, nor was Detective Cummings ever asked why he believed Cheeves and Taylor to be the same person.

41.    Police continued to serve the warrant, even though they knew the information contained in the body of the warrant was incorrect. Ms. Taylor was taken to homicide for a formal interview.

42.    Mr. Wallace's gunshot wound and subsequent treatment at Einstein resulted in him being questioned at the hospital. While under the influence of heavy pain medication due to his surgery, Mr. Wallace was coerced into giving two statements to the police. One was to Detective Gillespie and one was to Detective Poulus. In both of these statements, which were taken without Mr. Wallace ever having been advised of his rights, Mr. Wallace claimed to be the victim of a violent robbery.

43.    Detective Pitts also visited Mr. Wallace at Eisntein. During their interactions, Pitts advised Wallace that he believed Wallace to be involved in the Ernest Miller homicide and that he was going to prove it by ballistics evidence. As a result of Mr. Wallace's wounds, he continued, at the time of this interaction with Detective Pitts, to have portions of the bullet in his hip. Trauma surgeons had left those fragments in place to avoid more serious risks to Mr. Wallace's health and safety.

44.    Pitts believed that the ballistics evidence that was inside Mr. Wallace's body would provide the information he needed to secure an arrest and conviction. Pitts ordered Mr. Wallace's physicians to remove the fragment and give it to the police.

45.    Initially the doctors at Einstein refused, citing the obvious health risks that such a procedure would cause. Pitts persisted, deliberately disregarding risks that were explained to him, and obtained a court order to have the bullet fragment removed from Mr. Wallace's hip.

46.    Predictably, the medical procedure sought by Pitts did, in fact, cause significant additional injury to Mr. Wallace. As a result of the removal of bullet fragments, Mr. Wallace was forced to undergo extreme and outrageous pain and suffering, including a prolonged compromise of his ability to ambulate at all. He was required to use a wheelchair for many years after the incident. Although Mr. Wallace is finally able to walk without a walker, he continues to have extreme pain and limited mobility solely as a result of the actions taken by Defendants herein. It should also be noted that the ballistics evidence which Detective Pitts went to such destructive ends to retrieve was never used at trial.

47.    At the same time that Mr. Wallace was suffering coerced statements and physical torture, police had identified Raffinee Taylor as Kyle Reed's girlfriend and someone who might "help" solve the case.

48.    Detectives brow beat Raffinee Taylor, taking three statements from her over the course of three days. At the preliminary hearing and the trial, Ms. Taylor denied making the statements, saying that she had been intimidated and coerced by Detective Pitts. At trial, Judge Temin allowed those prior inconsistent statements to be received by the jury as substantive evidence.

49.     In those statements, Ms. Taylor allegedly told Detective Pitts that four years ago Reed had paid decedent Miller approximately $500 as part of a subscription service to take her photos, and to promote her as a model. No modeling assignments came from this arrangement. A few weeks before the shootout at decedent's home, Taylor allegedly ran into Miller, and told Reed of this encounter. Reed was angry, and said he was going to pay him a visit, which she took to mean he was going to get his money back.

50.     In its Opinion, the Superior Court determined that it was this statement to Raffincc Taylor that tied petitioner to the conspiracy, as opposed to him being merely present at the scene, stating "Significantly, the only connection between Appellant and Decedent was co-defendant's statement to Taylor that he intended to meet Decedent about the debt." *Commonwealth v. Wallace*, 2105 WL 7078938 at p 5.

51.     During the course of her interviews with Detective Pitts, Ms. Taylor also identified Reed's car as a black Honda with distinctive front-end damage. Video stills of this car dropping petitioner off at Albert Einstein Medical Center were recovered, and Vincent Wallace was subsequently arrested on January 6, 2009, and charged with the murder of decedent Miller, robbery, conspiracy and related charges.

52.     An Arrest Warrant for co-defendant Reed was also sworn out. Reed, however, was not arrested until April 20, 2009. The Commonwealth presented evidence of Reed's flight, requested and received a jury instruction regarding flight and the consciousness of guilt. Defense counsel for petitioner never requested a limiting instruction regarding this evidence.

53.     A bifurcated preliminary hearing was held in this case before the Honorable Jimmie Moore, starting on February 3, 2010, at which time the Commonwealth presented the testimony of Raffinee Taylor and Dwayne Tate, and concluded on April 21, 2010, at which time

the Commonwealth presented the testimony of Michelle Hinds, and Detectives Gillespie and Poulus.

54.     At the preliminary hearing, the Commonwealth provided defense counsel with the following documents: the three statements taken from Raffinee Taylor, two statements from Michelle Hinds, a copy of the ballistics report, copies of the Medical Examiner's reports, statements made by petitioner to the Detectives and a photo array shown to Duane Tate, as well as the statement taken from Duane Tate. Notably, a copy of Police Officer Haman's 75-483 was **not** provided.

55.     Following the conclusion of the preliminary hearing on April 21,2010, Mr. Wallace was held for court on all charges.

56.     Following a quash filed by trial counsel, the murder charge was graded as Second Degree, all other charges remained the same. On December 3, 2012, before the Honorable Judge Carolyn Engel Temin, a jury found Mr. Wallace guilty of Second-Degree Murder, Robbery, and Criminal Conspiracy.

57.     The same day as the verdict, Judge Temin sentenced Wallace to life in prison.

58.     The sentence was affirmed on June 8, 2015, at 122 A.3d 1126 (Pa. Super. 2015). This Superior Court Opinion is attached as Exhibit G.

59.     A Petition for Allowance of Appeal (Allocatur) was timely filed in the Supreme Court of Pennsylvania, at 381 EAL 2015. The Allocatur petition was denied on November 17, 2015, at 2015 Pa.Lexis 2643.

60.     On November 7, 2018, counsel received a telephone call from Assistant District Attorney Michael Garmisa from the Philadelphia District Attorney's Integrity Unit. Mr. Garmisa had been contacted by the PCRA Unit of his office to locate Mr. Wallace's file. Mr. Garmisa

simply wanted to confirm that he had no conflict in this matter, that he had never handled any aspect of this case while employed at the Defender Association. Counsel agreed that he had no conflict as he had never had any knowledge of the case's existence.

61.     ADA Garmisa informed counsel that the PCRA Unit was looking for the file in order to investigate our discovery requests that had been made via letter in April, 2017, and that Judge Geroff had ordered them to look into.

62.     ADA Garmisa then informed counsel of Judge Sarmina's written and filed Opinion in the case of Commonwealth v. Thorpe, and was surprised to learn that defense counsel had not been provided with a copy of this Opinion, as it was now standard that this Opinion be turned over as Brady material in every case involving Detective Pitts. He immediately emailed counsel a copy of *Commonwealth v. Thorpe*. His email and a copy of Thorpe are attached as Exhibit H.

63.     While counsel was aware of the existence of the Thorpe hearing from reading co-counsel's PCRA, counsel was not aware that there was a written Opinion that had become binding precedent in the Philadelphia Court of Common Pleas, that her granting of relief had become final, that her ruling was broader than simply granting relief to Mr. Thorpe, and that the Commonwealth had withdrawn its appeal, and there would be no Superior Court ruling on the matter. Counsel became aware of Judge Sarmina's holding in Thorpe, that Detective Pitts had engaged in a pattern and practice of coercion, such that statements taken by Detective Pitts did not meet the Brady/Lively standard for admission as substantive evidence on November 7, 2018 with the receiving of this Brady material from the Commonwealth. It is this binding Opinion that was Tiled on June 7, 2018, that is uncontested by the Commonwealth, that is now turned over in discovery as *Brady* material, that constitutes after-discovered evidence in this case.

14

64.     Had counsel had this ruling at the time of trial, Ms. Taylor's prior statements to Detective Pitts would not have come in as substantive evidence, the jury would not have been instructed that they could consider the statements as substantive evidence, and Mr. Conroy, the Assigned District Attorney who tried this matter, would not have been able to argue, as he did, that what she said therein was the truth.

65.     As referenced above, the Superior Court determined that Mr. Reed's statement to Ms. Taylor, which is contained in her last statement, was the only thing linking Petitioner to the conspiracy. Therefore, the outcome most certainly would have been different at trial had the jury not received the given instruction to consider the evidence as substantive evidence offered for the truth of the matter.

66.     Detective James Pitts has now been arrested, tried and convicted as a result of the exact same conduct that occurred in Mr. Wallace's case. Pitts' history of misconduct predates Mr. Wallace's criminal trial, yet that information was deliberately withheld from Mr. Wallace by the Individual Defendants and the City of Philadelphia.

67.     Mr. Wallace's conviction was sealed by the statements of Raffinee Taylor. She has already described, on the record, how she was coerced by Pitts and how the statements that were attributed to her by the Individual Defendants at trial were known by those Individual Defendants to be untrue at the time trial and yet were still presented to the jury as the truth. This presentation of false evidence helped secure the wrongful conviction of Mr. Wallace and caused him the damages complained of herein.

68.     The Defendants also deliberately concealed the fact that Detective Jenkins had a close personal relationship with Ernest "Flash" Miller. Cross examination regarding this issue would have changed the outcome of Mr. Wallace's criminal trials. This fact was known to all of

the Individual Defendants and was deliberately concealed prior to trial in order to help wrongfully convict Vicent Wallace.

**Policies and Practices in the City of Philadelphia**

69.     The Philadelphia Police Department's pattern and practice of unconstitutional misconduct in homicide investigations, including the coercion of confessions and suggestion of false statements from witnesses, and the suppression of exculpatory and inconsistent evidence dates back to at least the 1970's and continued beyond the timeframe that the individual Defendants investigated and prosecuted Mr. Wallace.

70.     From at least the 1970's, and continuing well beyond the timeframe that the individual Defendants investigated and prosecuted Mr. Wallace, the City of Philadelphia had in force and effect policies, practices, and customs of unconstitutional misconduct in homicide investigations, including but not limited to using coercive techniques in interviews to obtain false and misleading statements from witnesses, fabricating inculpatory statements from witnesses and evidence, coercing and suggesting false identifications of suspects through the use of unconstitutional identification procedures, withholding exculpatory and inconsistent evidence, ignoring eyewitness interviews, and fabricating incriminating statements from witnesses by feeding details about the crime to the witnesses.

71.     At the time of the investigation and prosecution of Mr. Wallace, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to make false statements by witnesses appear true and reliable, including but not limited to: providing a witness with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication; taking misleading

16

investigative steps to make statements appear more credible; selectively documenting witness statements and not the preceding interrogation, interview, preparation, or rehearsal; selectively recording witness' interviews; and misrepresenting that a suspect's formal statement was a verbatim statement in the suspect's own words, even when paraphrased or altered.

72.    At the time of the investigation and prosecution of Mr. Wallace, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to coerce false statements, including but not limited to: subjecting witnesses to needlessly prolonged interrogations and interviews; isolation; making promises, regardless of their truthfulness; threatening charges for unrelated misconduct; offering assistance in unrelated criminal matters, including pending or recently dismissed criminal charges; interviewing witnesses while they are under the influence of mind-altering narcotics that made them more susceptible to coercion and the drugs' mind-altering effects; and asserting that the witness will benefit in some way from making a statement that assists the police, and suffer some sort of disadvantage if they do not assist.

73.    At the time of the investigation and prosecution of Mr. Wallace, the Philadelphia Police Department had a policy, practice, or custom involving the use of various techniques to suppress or withhold exculpatory or inconsistent statements and evidence, in violation of their known duty under *Brady*, including but not limited to: making false statements to prosecutors about the existence of evidence; failing to provide complete homicide files to prosecutors; coercing witnesses into keeping exculpatory and inconsistent information from prosecutors; refusing to testify at trial; discarding or deleting exculpatory and inconsistent information from homicide files; ignoring exculpatory and inconsistent information so that there is no record to be deleted from homicide files; farming out portions of Homicide investigations to police officers

outside the Homicide Unit or other detectives assigned to the Homicide Unit so as to maintain a lack of evidence of their participation; and threatening witnesses in possession of exculpatory and inconsistent information to prevent them from coming forward to prosecutors or testifying.

74.     Furthermore, at the time of the investigation and prosecution of Mr. Wallace, the Philadelphia District Attorney's office had a policy, practice, or custom of withholding exculpatory or inconsistent statements and evidence, in violation of their known duty under *Brady*, including but not limited to: making false statements about the existence of evidence; allowing witnesses to provide false testimony; discarding or deleting exculpatory and inconsistent information from their files; ignoring exculpatory and inconsistent information so that there is no record to be deleted from their files.

75.     At the time of the investigation and prosecution of Mr. Wallace's case, the Philadelphia Police Department had a policy, practice, or custom of detaining, arresting, threatening, and interrogating purported witnesses in criminal investigations without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions, or for material benefits.  These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel.

76.     At the time of the investigation and prosecution of Mr. Wallace's case, the Philadelphia Police Department had a policy, practice, or custom of maintaining a deliberately biased Internal Affairs Division that exonerated police officers and detectives, including Homicide Detectives, regardless of the evidence of misconduct.

77.     At the time of the investigation and prosecution of Mr. Wallace's case, the Philadelphia Police Department had a policy, practice, or custom involving the intentional use of untruthful affidavits of probable cause to support arrest warrants that, in violation of their

constitutional duties, failed to recite the totality of circumstances, including exculpatory information, and cited fabricated evidence, statements from coerced witnesses, omitted mention of credible exculpatory witness statements, and mischaracterized the nature of unconstitutional identifications. The City of Philadelphia failed to train and supervise its officers and detectives to deter or end this policy, practice, and custom.

78.     These practices are well-known to the City of Philadelphia and its policymakers with respect to criminal investigations and prosecutions as a result of newspaper investigations, including the Philadelphia Inquirer's Pulitzer Prize winning reporting in 1977-78, governmental investigations, including the Philadelphia Police Department's 39th District Corruption Scandal in the 1990's, complaints from the public, complaints from attorneys, complaints from whistleblowers, prior litigation, including employment complaints to the EEOC, and internal police investigations.

79.     The Philadelphia Police Department was deliberately indifferent to officers' misconduct and credible complaints to the Police Department's internal compliance department were disregarded.

80.     Various cases involving the exoneration of individuals accused of murder, individuals yet to be exonerated, and individuals who were in fact guilty demonstrate that this misconduct was pervasive within the City of Philadelphia in both the Police Department and District Attorney's office both before and after it investigated and prosecuted Mr. Wallace, and, upon information and belief, the misconduct described in this Complaint was tacitly, if not expressly, permitted by, committed with, or deliberately ignored when committed in the presence of Homicide Unit, Philadelphia Police Department, and/or District Attorney supervisors.

81.    Convictions that later resulted in exonerations demonstrate the rampant patterns, practices, and customs of official misconduct within the City of Philadelphia Police Department and a prior administration of its District Attorney's Office:

a.    *Commonwealth v. Antonio Martinez* – This matter was investigated in 1985 and resulted in the exoneration of Mr. Martinez after more than 30 years of incarceration.  It was determined that during his 1990 trial the Philadelphia Police and District Attorney's withheld information in their files which were later determined to contain numerous pieces of evidence implicating another suspect in the murder, including an eyewitness who informed police that another individual committed the murders.;

b.    *Commonwealth v. Raymond Carter* – This matter, which was investigated from 1986 until his conviction in 1988, resulted in the exoneration of Mr. Carter after former police officer Thomas Ryan was indicted in February 1995 on federal corruption charges.  A Philadelphia judge ordered a new trial because the prosecution's star witness had been paid $500 by then-officer Ryan to testify against Carter.  The City of Philadelphia paid a "churchgoing grandmother" a significant settlement after she sued alleging Ryan helped frame her and send her to prison for 3 years.  In 1996, the Philadelphia Inquirer reported that Officer Jack Baird, who was Ryan's partner, fabricated evidence because Ryan wanted the overtime compensation often available to officers in murder investigations.

c.    *Commonwealth v. Messrs. Gilyard & Wells* – This matter, which was investigated in August 1995 and resulted in the exoneration of the defendants after periods of wrongful incarceration, involved the fabrication and coercion of witness statements, garnering of false identifications based on suggestive police behavior, the suppression of exculpatory evidence and the submission of untruthful affidavits of probable cause when seeking arrest warrants.;

d.    *Commonwealth v. Donald Ray Adams* – Mr. Adams' case was investigated beginning in 1990 until his conviction in 1992.  Police ignored the physical description of the suspect provided by numerous eyewitnesses and instead opted to pressure and coerce an eyewitness with a crack cocaine addiction and criminal history.  Mr. Adams' was eventually granted a new trial and a jury returned a verdict of not guilty in 2011.;

e.    *Commonwealth v. Jimmy Dennis* – Mr. Dennis' case was investigated from 1991 until he was sentenced to death in 1992. Nearly 25 years later, the United States Court of Appeals for the Third Circuit, sitting *en banc* vacated Mr. Dennis' conviction, holding that constitutional violations by Philadelphia Police Department Homicide detectives had undermined the fairness of Mr. Dennis' trial. Philadelphia Police Department Homicide detectives coerced witnesses, fabricated evidence, engaged in deliberate deception by concealing and

suppressing material evidence, employed unlawful investigate techniques, presented false testimony, and denied Mr. Dennis due process of law and a fair trial.;

f.  *Commonwealth v. Percy St. George* – Mr. St. George's case was investigated from 1993 until 1994. A Philadelphia Police Department Homicide Detective obtained a statement from a man who signed another person's name because of his fugitive status. As the trial approached, the Homicide Detective coerced the person whose named appeared in the signature to provide and sign a fabricated statement and to falsely identify Mr. St. George from an overly suggestive sham photo array. Upon further investigation, evidence suggested the homicide detectives coerced the witnesses into providing false statements and false identifications. The Detectives pleaded their Fifth Amendment right against self-incrimination rather than testify as to how they obtained the statements and identification.; and

g.  *Commonwealth v. Andrew Swainson* – In 1989, Andrew Swainson was convicted of murder on the statement of a single eyewitness, Paul Presley. Presley was an original suspect arrested for the shooting moments after it occurred, covered in blood and running from the scene at 3:40 a.m. The prosecution dropped charges against Presley three weeks later. Det. Santiago soon took a statement from Presley. Presley explained Det. Santiago's tactics: Presley had not seen Swainson at the time of the shooting, and only knew what he looked like because he'd been shown his picture by Det. Santiago. Rather than showing Presley a real photo array, *all seven photos that Det. Santiago showed Presley were of Swainson*. Presley explained that he only testified against Presley because he was coerced with threats of being charged for a separate drug crime. (Presley was charged under a different name, and the Commonwealth never disclosed the matter Commonwealth v. Kareem Miller, DC No. 881855934; CP-51-CR-1024751, to Mr. Swainson.) Mr. Swainson was exonerated in 2020.

h.  *Commonwealth v. Onyiah* – Following a 2010 homicide, Detectives Pitts and Jenkins used coercive means to fabricate evidence and obtain a false confession in a case where surveillance video confirmed that the confession was false and that Onyiah could not have committed the crime. That conviction was later overturned and forms the basis for Detective Pitts' pending criminal trial.

i.  *Commonwealth v. Jamaal Simmons* – In 2012 Jamaal Simmons was convicted for the 2009 murder of Rodney Barnes. That conviction was overturned based on Nordo's having coerced two witnesses into making false statements.

j.  *Commonwealth v. Frazier* – When 19-year-old James Frazier was brought in to the PAB by Nordo for questioning related to a homicide, Nordo threatened to sexually assault him if he did not sign a coerced and fabricated confession. After approximately seven years in prison, Frazier's conviction was overturned because of Nordo's conduct.

82.     As a result of the pattern of police misconduct that was in effect at the time of the investigation of the homicide for which Mr. Wallace was charged, the United States District Court for the Eastern District of Pennsylvania entered a consent decree in the matter of NAACP v. City of Philadelphia requiring wide-ranging reforms in the Philadelphia Police Department and, in particular, providing for specific limitations on the investigative practices and policies of the Philadelphia Police Department.

83.     During the 1980's and 1990's, and concurrent with the time of the investigation of this case by the Philadelphia Police Department, there was within the Department a pattern, practice and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.  On three separate occasions in the 1980's, the United States District Court of Eastern District of Pennsylvania issued orders enjoining the Philadelphia Police Department from engaging in these practices:

a. *Cliett v. City of Philadelphia* (1985): consent decree arising out of "Operation Cold Turkey," which resulted in the unlawful arrest and detention of 1500 individuals in drug sweeps.;

b. *Spring Garden Neighbors v. City of Philadelphia* (1985): enjoining police sweeps of Latinos in the Spring Garden neighborhood as a part of a Homicide Unit investigation.; and

c. *Arrington v. City of Philadelphia* (1988): enjoining unconstitutional stops, detentions and searches of Black men during the "Center City Stalker" investigation.

64.     At the time of the investigation and prosecution of Mr. Wallace, the Philadelphia Police Department had a practice, policy, and/or custom of:

a. engaging in unlawful interrogations of witnesses, witness detentions and interrogations, planting of evidence, fabrication of witness and suspect statements, coercing false identifications through the use of unconstitutional identification procedures, coercing false confessions through the use of unconstitutional conduct and procedures, and failing to disclose exculpatory statements and evidence;

    b.   failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;

    c.   failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search, and arrest powers;

    d.   ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police interrogations, searches and arrests, coercion of witnesses and suspects, falsifying and fabricating evidence, coercion of false identifications through the use of constitutionally defective identification procedures coercion of false confessions through the use of unconstitutional conduct and procedures, and suppression of exculpatory evidence;

    e.   failing to properly sanction or discipline Philadelphia Police Department officers, who are aware of and conceal or aid and abet violations of constitutional rights of individuals by other Philadelphia Police Department officers, thereby causing and encouraging Philadelphia Police, including the individual Defendants in this case, to violate the rights of citizens such as Mr. Wallace.

65.    At the time of the investigation and prosecution of Mr. Wallace, and for many years before and thereafter, the Philadelphia Police Department and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers. The Internal Affairs Division of the Philadelphia Police Department has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

    a.   the Philadelphia Police Department's internal investigatory process was riddled with excessive and chronic delays in resolving disciplinary complaints;

    b.   the Philadelphia Police Department lacked consistent, rational, and meaningful disciplinary and remedial actions;

    c.   the Philadelphia Police Department failed to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

    d.   the Philadelphia Police Department's internal investigatory process fell below the accepted standards and practices and was arbitrary and inconsistent;

    e.   the Philadelphia Police Department discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to

their number of violations;

f.  the conduct of Internal Affairs investigations demonstrated that the Philadelphia Police Department internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g.  a global analysis of Internal Affairs' investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h.  the Philadelphia Police Department lacked an effective early warning system to identify, track, and monitor "problem" officers;

i.  Internal Affairs failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, and interviews that were conducted were below acceptable standards of police practices and failed to address key issues.

## **DAMAGES**

66.     The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Mr. Wallace to be improperly arrested and subjected to the horrors of imprisonment, unfairly tried, wrongfully convicted and forced to serve over eight years in prison for a crime he did not commit.

67.     As a direct result of Defendants' conduct and omissions, Mr. Wallace sustained injuries and damages, including loss of freedom for more than fourteen years, loss of his relationships with family members, pain and suffering, mental anguish, emotional distress, countless indignities, degradation, permanent loss of natural psychological development, loss of life's pleasures, and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, voting, travel, enjoyment, and freedom of speech and expression.

68.    As a direct result of Defendants' conduct and omissions, Mr. Wallace sustained economic injuries and damages, including loss of income from the employment he maintained before his wrongful arrest and incarceration and the loss of career opportunities.

69.    As a direct result of Defendants' conduct and omissions, Mr. Wallace sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

## COUNT I
### 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments
### (Against all Individual Defendants)

70.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

71.    The individual Defendants, acting with malice individually and in concert, and knowing that probable cause did not exist to prosecute Mr. Wallace for Ernest Miller's murder, intentionally caused Mr. Wallace to be arrested, charged, and prosecuted for those crimes, thereby violating Mr. Wallace's clearly established right, under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of prosecution absent probable cause.

72.    The individual Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and prosecution without probable cause.

73.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Wallace's clearly established constitutional rights. No reasonable officer in 2008 and 2009 would have believed this conduct was lawful.

74.     The prosecution finally terminated in Mr. Wallace's favor on March 9, 2023, when the DAO requested that the court *nolle pros* the case.

75.     The acts and omissions by the individual Defendants described in the preceding paragraphs were the direct and proximate cause of Mr. Wallace's injuries as these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Mr. Wallace.

## COUNT II
**42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation (Against All Individual Defendants)**

76.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

77.     The individual Defendants, acting individually and in concert, and within the course and scope of their employment with the Philadelphia Police Department deprived Mr. Wallace of his clearly established constitutional right to due process of law and to a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements, including without limitation: the false statements of witnesses; Mr. Wallace fabricated confession; and misleading presentation of phone calls.

78.     The individual Defendants deprived Mr. Wallace of his right to a fair trial by withholding material exculpatory and impeachment evidence, including without limitation, withholding information regarding Detective Pitts' background.

79.     The individual Defendants deprived Mr. Wallace of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to obtain complete witness statements and conduct a complete investigation.

80.     The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Wallace's clearly established constitutional rights.  No reasonable officer in 2008-2009 would have believed this conduct was lawful.

81.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Wallace's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Wallace's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT III
**42 U.S.C. § 1983 Violation of Plaintiff's Right Against Self-Incrimination in Violation of the Fifth and Fourteenth Amendments**
**(Against All Individual Defendants)**

82.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

83.     Mr. Wallace was repeatedly interrogated without being informed of his rights and without being able to make a knowing and informed decision about his participation in the interrogation. This conduct by the individual defendants violated Mr. Wallace's constitutional rights and led to his wrongful conviction and the damages claimed herein.

84.     Ultimately, Mr. Wallace's coerced statements were used against him trial, thereby violating Mr. Wallace's right against self-incrimination.

85.    As a direct and proximate result of Defendants' actions, Mr. Wallace was wrongly prosecuted, detained, and incarcerated for over fourteen years and suffered other injuries and damages as set forth above.

## COUNT IV
### 42 U.S.C. § 1983 Civil Rights Conspiracy
### (Against All Individual Defendants)

86.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

87.    The individual Defendants, acting within the course and scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Wallace of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, self-incrimination, and his right to a fair trial.

88.    In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.    Suggesting, coercing, and/or fabricating inculpatory evidence in the form of witness statements;

b.    Coercing Mr. Wallace's hospital statements;

c.    Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* and impeachment material during the pendency of the case;

d.    Wrongfully prosecuting Mr. Wallace while knowing that they lacked probable cause; and

e.    Committing perjury during hearings and trials.

89.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Wallace's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Wallace's wrongful arrest, prosecution, conviction, and incarceration.

**COUNT V**
**42 U.S.C. § 1983 Failure to Intervene**
**Against All Individual Defendants**

90.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

91.     By their conduct and under color of state law, the individual Defendants, acting within the course and scope of their employment with the Philadelphia Police Department, had opportunities to intervene on behalf of Mr. Wallace to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

92.     These Defendants' failures to intervene violated Mr. Wallace's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable police officer in 2008-2009 would have believed that failing to intervene to prevent these Defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, withholding material exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Wallace to be arrested and prosecuted without probable cause, were lawful acts.

93.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Wallace's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Wallace's wrongful arrest, prosecution, conviction, and incarceration.

**COUNT VI**
**42 U.S.C. § 1983 Municipal Liability Claim**
**(Against Defendant City of Philadelphia)**

94.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

95.     The City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Mr. Wallace's wrongful arrest and conviction, and for many years preceding and following this investigation a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations, including in particular the use of coercive techniques in interviews and interrogations to obtain confessions; the fabrication of inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory evidence.

96.     Final policymakers for the City of Philadelphia had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions; withholding exculpatory evidence; fabricating inculpatory evidence; and, particularly, fabricating incriminating statements from witnesses,

suspects, and arrestees by coercion, suggestion, and feeding details about the crime, and failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

97.     Mr. Wallace's injuries and damages were further proximately caused by policies and practices on the part of policymakers with responsibility of administration of the District Attorney's office to allow the withholding of exculpatory and/or inconsistent evidence, allow witness to provide false testimony, and to pursue profoundly flawed investigations and prosecutions.

98.     The widespread practices described in the preceding paragraphs, of which the City of Philadelphia had actual or constructive notice, were allowed to flourish because the Police Department and District Attorney's office declined to implement sufficient training and/or any legitimate mechanisms for oversight or punishment.

99.     Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Mr. Wallace's wrongful arrest, prosecution, and fourteen years of incarceration, as well as all the other injuries and damages set forth above.

## COUNT VII
### Malicious Prosecution Under Pennsylvania State Law
### (Against All Individual Defendants)

100.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

101.     The individual Defendants initiated or continued proceedings against Mr. Wallace, without probable cause, with malice or specific intent to injure, and the proceedings ultimately terminated in Mr. Wallace's favor on March 9, 2023, when the DAO asked the court to *nolle pros* all charges.

102.    As a result of this malicious prosecution, Mr. Wallace sustained the injuries and damages set forth above.

## **PUNITIVE DAMAGES**

103.    The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

104.    The conduct of the individual Defendants was outrageous, malicious, wanton, willful, reckless, and intentionally designed to inflict harm upon Plaintiff.

105.    As a result of the acts of the Defendants alleged in the preceding paragraphs, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff requests the following relief:

a.  That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

b.  That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

c.  A declaratory judgment that the practices and policies complained of are unconstitutional;

d.  For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

e.  For such other and further relief as appears reasonable and just.


MARRONE LAW FIRM, LLC

By:    s/ Michael D. Pomerantz

    Michael D. Pomerantz, Esquire
    Attorney for Plaintiff
    200 South Broad Street, Suite 610
    Philadelphia, PA  19102
    (215) 732-6700
    mpomerantz@marronelaw.com
    PA Atty ID# 83415

    Date: January 17, 2025