**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **VINCENT WALLACE,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 25-290-KSM** |
| **CITY OF PHILADELPHIA, et al.,** | |
| Defendants. | |

<u>**MEMORANDUM**</u>

Marston, J.                                                    **October 15, 2025**

Plaintiff Vincent Wallace spent fourteen years in prison for a murder he did not commit.

Wallace alleges that several Philadelphia Police Department Detectives and the City of

Philadelphia played a role in his wrongful conviction.  (Doc. No. 1.)  Presently before the Court

are motions to dismiss filed by Defendants the City of Philadelphia; Detectives Ohmarr Jenkins,

Matthew Gillespie, and James Poulos (collectively, the "City Defendants"); and former

Detective James Pitts.  (Doc. Nos. 13, 25.)  Wallace opposes their motions.  (Doc. Nos. 14, 32.)

For the reasons below, the Court grants the motions and dismisses Wallace's claims against all

Defendants in part with prejudice and in part without prejudice.[1]

---

[1] Defendant Detective Jack Cummings has not joined either motion to dismiss or otherwise filed a responsive pleading.  Nevertheless, because Wallace's claims against Detective Cummings fail for the same reasons that his claims fail against Detectives Jenkins, Gillespie, and Poulos, and Wallace had an opportunity to respond to those arguments to the extent they were raised by the City Defendants, the Court may sua sponte dismiss the claims against Detective Cummings.  *See Coulter v. Unknown Probation Officer*, 562 F. App'x 87, 89 n.2 (3d Cir. 2014) ("Because, as the following discussion makes clear, the District Court properly dismissed the complaint based on grounds raised by Extended Stay defendants, but common to all defendants, and to which Coulter had an opportunity to respond, we find no merit to her argument" that the district court lacked "authority to sua sponte dismiss the complaint against Unknown Officer.").

## I.    FACTUAL BACKGROUND[2]

Wallace's claims arise out of the events surrounding the unfortunate death of two men—Michael Grant and former Philadelphia Police Officer Ernest "Flash" Miller—and the resulting criminal investigation.  Although Wallace's Complaint provides a general overview of these events, there are multiple gaps in his allegations, which sometimes render the narrative difficult to follow.[3]

### A.    The Incident

Wallace's life changed forever on December 28, 2008.  That day, a man he knew from the neighborhood, Kyle Reed, told him about an opportunity for contracting work at a residence in North Philadelphia.  (Doc. No. 1 at 5.)  Wallace ran a contracting business, so he agreed to go with Reed to check out the opportunity.  (*Id.*)  Reed picked up Wallace in a "black Honda Accord with distinctive front-end damage."  (*Id.* at 6.)  Reed was not alone in the car, however, as another man, Michael Grant, was sitting in the front passenger seat.  (*Id.*)

Reed drove them to a house on 26th and Oakdale Street and parked his car on the street.  (*Id.*)  Reed and Grant then exited the vehicle and told Wallace to stay put.  (*Id.*)  Wallace eventually got tired of waiting and exited the car with the intention of taking a bus home.  (*Id.*)  Reed spotted him, however, and beckoned him to come inside the house.  (*Id.*)

---

[2] These allegations come from Wallace's Complaint.  (Doc. No. 1.)  The Court assumes their truth for purposes of this motion.  *See Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

[3] This confusion is caused in part by Wallace's counsel's failure to attach any of the exhibits referenced throughout the Complaint.  (*See, e.g.*, Doc. No. 1 at 9.)  In addition, many paragraphs of the Complaint appear to have been copied wholesale from a prior PCRA petition or some other filing.  (*See id.* at 9 (referencing an "Exhibit E" despite not having referenced any prior exhibits); *id.* at 14 (describing information as "after-discovered evidence"); *see also generally id.* (providing no discussion of the proceedings that led to Wallace's release).)

Once inside with Reed, Wallace saw Grant sitting on a chair in the living room and another man sitting on the stairs to the second floor.  (*Id.*)  The man on the stairs was later identified as Ernest "Flash" Miller.  (*Id.*)  Wallace began to introduce himself to Miller when suddenly Grant and Miller started shooting at each other.  (*Id.*)  Reed ran out of the house, but Wallace froze and was shot by Grant during the gunfight.  (*Id.*)  When the shooting stopped, Miller was dead, and Grant and Wallace were injured.

Reed then returned to the house, collected the guns, and tried to rescue Grant.  (*Id.* at 7.) He managed to pull Grant to the doorway but could not move him any further, and Grant ultimately passed away.  (*Id.*)  Meanwhile, Reed and an injured Wallace got back into the black Honda and drove away.  (*Id.*)  After driving around for a while, Reed dropped Wallace off at the Albert Einstein Medical Center ("Einstein").  (*Id.*)

### B.    The Investigation

Not long after the shootout, police officers arrived at the scene.  (*Id.*)  There, they discovered the two deceased gunshot victims—Grant and Miller.  (*Id.*)  Although they found no guns or DNA evidence in the residence, a ballistics analysis revealed that a semi-automatic handgun and revolver were used during the gunfight.  (*Id.*)

#### 1.    Police Interview Witnesses

After discovering the two victims, officers began canvassing the neighborhood and speaking to witnesses, two of whom are relevant to the pending motions to dismiss.  (*Id.*)

*Witness 1: Duane Tate.*  Police Officer Saverio Haman overheard one witness at the scene, Duane Tate, saying that he had seen a man with a limp enter the front passenger seat of a black Honda Accord.  (*Id.* at 7–8.)  Later, Tate allegedly "gave a statement that contradicted the information obtained by [Officer] Haman," but it is unclear when Tate's subsequent statement

3

was taken, who took it, or how it contradicted the information obtained by Officer Haman. (*Id.* at 8.) Tate testified at the preliminary hearing, but he passed away before Wallace's murder trial. (*Id.*)

**Witness 2: Kiara Cheeves.** A woman identified as Kiara Cheeves also spoke with officers at the scene, and she was taken to the police station to give a formal statement. (*Id.* at 7.) At the station, Detectives Fetters and Mangioni[4] interviewed her. (*Id.* at 8.) Cheeves told them that she had been at Miller's house earlier in the day on December 28 but left to go to the hair salon before the shootout occurred. (*Id.*) Cheeves was stopping by the house to pick up the clothing she had left there when the officers arrived on scene. (*Id.*) Although she had items in Miller's house and was around the crime scene around when officers arrived, Cheeves was released and never reinterviewed. (*Id.*) Detectives later discovered that "Kiara Cheeves" was a fake name, but they did not disclose that fact to Wallace's defense counsel until Defendant Detective Ohmar Jenkins testified at Wallace's trial. (*Id.* at 9.)

## 2.    Police Identify Reed as a Suspect

Police ultimately identified Michael Grant as the second gunshot victim. (*Id.*) Once this identification was made, officers located and interviewed Grant's wife, Michelle Hinds. (*Id.*) Hinds told officers that on December 28, Grant had gone out to make a "run" with Reed. (*Id.*) And shortly after the shootout, Reed had contacted Hinds and told her in person that Grant "did not make it back from this one." (*Id.*)

Based on Hinds's statement, detectives zeroed in on Reed as a suspect. From an old protection-from-abuse order, detectives learned that Reed had a girlfriend named Raffinee

---

[4] No first name is given for either Detective.

Taylor.  (*Id.*)  Defendant Detective Jack Cummings drafted a statement of probable cause for a search warrant for Taylor's home.  It appears at some unidentified point, Detective Cummings believed that Taylor was the woman who had previously posed as Kiara Cheeves.  (*Id.*)  It is unclear, however, when or why Detective Cummings came to this conclusion, and confusingly, the Complaint suggests Taylor and Cheeves are actually not the same person.[5]  In any event, after police served the search warrant, Taylor was brought to the police station for a formal interview.  (*Id.*)

Wallace alleges that detectives, including former Detective Pitts "brow beat Raffinee Taylor, taking three statements from her over the course of three days."  (*Id.* at 11.)  In those statements, Taylor explained that four years before the shootout, Reed had paid Miller around $500 to take pictures of Taylor and to promote her as a model, but no modeling jobs came from this arrangement.  (*Id.* at 12.)  A few weeks before the shooting, Taylor had run into Miller and told Reed about their encounter.  (*Id.*)  Reed became agitated and said he was going to pay Miller a visit, which Taylor interpreted to mean that Reed was going to get the $500 back from Miller.  (*Id.*)  "Taylor also identified Reed's car as a black Honda with distinctive front-end damage."  (*Id.*)

### 3.    Police Interview Wallace and Extract Bullet Fragments from His Hip

While detectives investigated the shootout, Wallace was being questioned at Einstein Hospital about his gunshot wound.  (*Id.* at 10.)  Wallace alleges that he was "coerced into

---

[5] Wallace alleges that Detective Jenkins testified at Wallace's trial that the officers realized Taylor and Cheeves "were not the same person" when the real Taylor drove by the house while the police were executing the search warrant. (Doc. No. 1 at 10.)  Wallace also notes that (1) Detectives Fetters and Mangioni—the two detectives who interviewed Cheeves—were not the same detectives who concluded Taylor and Cheeves were different people, and (2) "Detective Cummings [was] never asked why he believes Taylor and Cheeves to be the same person."  (*Id.*)

giving" statements to Defendant Detectives Matthew Gillespie and James Poulos, telling both Detectives that he was shot during a violent robbery. (*Id.*) Wallace alleges that Detectives Gillespie and Poulos failed to advise him of his *Miranda* rights before they "interrogated" him and that he made both statements while "under the influence of heavy pain medication due to his surgery." (*Id.* at 10, 27.)

Pitts also visited Wallace multiple times at the hospital. (*Id.* at 10.) During their interactions, Pitts told Wallace that he believed Wallace was involved in the Miller homicide and was going to prove it through ballistic evidence. (*Id.*) Wallace had bullet fragments in his hip, which the "[t]rauma surgeons had left . . . in place to avoid more serious risks to [Wallace's] health and safety." (*Id.*) Despite these risks, Pitts ordered Wallace's doctors to remove the bullet fragments and give them to the police. (*Id.* at 11.) Although the doctors initially refused, Pitts "obtained a court order to have the bullet fragments removed." (*Id.*) Because of this surgery, Wallace had to use a wheelchair for years afterwards. (*Id.*) Although Wallace is now able to walk, he still experiences pain and limited mobility due to the additional surgery. (*Id.*) Worse still, the ballistic evidence "was never used at trial." (*Id.*)

### C.    The Conviction and Sentence

On January 6, 2009, Wallace was arrested and charged for Miller's murder as well as for robbery, conspiracy, and other related charges. (*Id.* at 12.) Although not entirely clear, the basis for Wallace's arrest appears to have been Taylor's statements and video stills of a black Honda dropping Wallace off at Einstein. (*Id.*) An arrest warrant was also issued for Kyle Reed, but Reed was not arrested until April 20, 2009. (*Id.*)

The state court held a "bifurcated preliminary hearing" that started on February 3, 2010, and ended on April 21, 2010. (*Id.*) In February, the Commonwealth presented testimony from

two of the witnesses discussed above, Taylor and Tate.  (*Id.*)  Of note, "Taylor denied making" any statements to Pitts and claimed that "she had been intimated and coerced" during her interviews with detectives.  (*Id.* at 11.)  In April, the Commonwealth presented additional testimony, this time from Hinds (Grant's widow) and Detectives Gillespie and Poulos.  (*Id.* at 12–13.)  Throughout these proceedings, the Commonwealth turned over multiple documents to Wallace's defense counsel:  (1) three statements from Taylor, (2) Tate's statement and a photo array shown to Tate, (3) two statements from Hinds, (4) the ballistics report, (5) the medical examiner's reports, and (6) the statements made by Wallace.[6]  (*Id.* at 13.)  At the end of the preliminary hearing, "Wallace was held for court on all charges."  (*Id.*)

Wallace's defense lawyer later filed a motion to quash.  (*Id.*)  The subject of the motion is unclear, but Wallace does allege that it led to his murder charge being graded as second-degree murder.  (*Id.*)  The robbery, conspiracy, and other charges remained the same.  (*Id.*)  And on November 26, 2012, the case was brought to trial before a jury.  During Wallace's trial, Taylor again claimed that her prior statements had been coerced by Pitts, but the Commonwealth nevertheless used those statements to impeach Taylor, introducing them as substantive evidence. (*Id.* at 2; *see also id.* (alleging that Taylor's "false statement was read back to the jury, even though it was known to be untrue").)  Assistant District Attorney ("ADA") Conroy also argued before the jury that Taylor's prior statements were in fact true.  (*Id.* at 15.)

---

[6] Wallace alleges that "a copy of Police Officer Haman's 75-483 was **not** provided."  (Doc. No. 1 at 13.)  Wallace's Complaint does not explain what a 75-483 is or why it is significant that it was not provided.  It appears that a 75-483 refers to a police interview record.  (*See* Doc. No. 13 at 11 n.3.)  Although Wallace alleges that Officer Haman took Tate's witness statement, it is unclear whether that is the interview to which Wallace is referring as Wallace does not specify whose interview was recorded in the 75-483 or what was said during the interview.

On December 3, 2012, a jury found Wallace guilty of second-degree murder, robbery, and criminal conspiracy. (*Id.*) After the jury returned a verdict of guilty, the Honorable Carolyn Engel Temin sentenced Wallace to life in prison. (*Id.*) Wallace's sentence was affirmed in all relevant respects by the Pennsylvania Superior Court on June 8, 2015. (*Id.* (citing *Commonwealth v. Wallace*, No. 3489 EDA 2012, 2015 WL 7078938, at *7 (Pa. Super. Ct. June 8, 2015)).)[7] Wallace petitioned the Supreme Court of Pennsylvania to hear an appeal, but his petition was denied on November 17, 2015. (Doc. No. 1 at 13.)

### D.    The Vacatur

Around three years later, on November 7, 2018, ADA Michael Garmisa of the Conviction Integrity Unity in the Philadelphia District Attorney's Office called Wallace's lawyer. (*Id.*) During the call, ADA Garmisa informed counsel that on June 7, 2018, the Honorable Teresa Sarmina entered an opinion and order in *Commonwealth v. Dwayne Thorpe*, CP-51-CR-0011433-2008, which held that "Detective Pitts had engaged in a pattern and practice of coercion, such that statements taken by Pitts did not meet the *Brady/Lively* standard for admission as substantive evidence." (*Id.* at 14.) ADA Garmisa emailed Wallace's lawyer a copy of the opinion.[8]

At some point in 2023—Wallace does not give the exact date—Wallace's conviction was vacated because of "illegal activity committed by Detective James Pitts." (*Id.* at 1, 3.) The Philadelphia District Attorney's Office chose not to retry Wallace for Miller's murder, and

---

[7] Although the appellate court found that Wallace's "conviction for murder and robbery merge" and "vacate[d] the sentence for robbery," the court's decision did "not affect [Wallace's] aggregate sentence." *Wallace*, 2015 WL 7078938, at *6.

[8] In his Complaint, Wallace cites to Judge Sarmina's opinion in *Commonwealth v. Thorpe* and says a copy of the decision is "attached as Exhibit H." (Doc. No. 1 at 14.) However, as noted earlier, *see supra* n.3, there are no exhibits attached to Wallace's Complaint.

instead, on March 9, 2023, asked the Commonwealth court to *nolle pros* the charges against Wallace because "Detective Pitts was heavily involved in the investigation" and without evidence from Detective Pitts, the Commonwealth "would not have enough evidence to survive defense's motion to quash or even a judgment of acquittal at this stage." (*Id.* at 1.)

### E.    Allegations Specific to Pitts

In addition to this general narrative, Wallace makes several specific allegations against Pitts.  First, he alleges that Pitts has now been arrested, tried, and "convicted of concealing and fabricating evidence, often through violent means, to obtain arrests and convictions." (*Id.* at 2.) Second, he alleges that this misconduct by Pitts predates Wallace's criminal trial, yet Pitts deliberately withheld his own history of misconduct from Wallace.  (*Id.* at 15.)

## II.    PROCEDURAL HISTORY

On January 17, 2025, Wallace brought this lawsuit against the City of Philadelphia, Detectives Jenkins, Cummings, Gillespie, and Poulos, and former Detective Pitts.  (*Id.* at 1.)  In the Complaint, Wallace alleges that the individual Defendants violated his constitutional rights by maliciously prosecuting him, fabricating evidence, withholding exculpatory evidence, failing to conduct an adequate investigation, violating his right against self-incrimination, conspiring to violate his civil rights, and failing to intervene and prevent constitutional violations.  (*See generally id.*)  Wallace also argues that the City of Philadelphia is liable under *Monell v. Department of Social Services*, 436 U.S. 658, 694–95 (1978).

On March 31, 2025, the City Defendants moved to dismiss Wallace's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 13.)  Two weeks later, Wallace filed a response in opposition to the City Defendants' motion to dismiss.  (Doc. No. 14.)  On May 5,

2025, Pitts filed a motion to dismiss Wallace's claims against him.  (Doc. No. 25.)  Wallace

responded to Pitts's motion to dismiss two weeks later.  (Doc. No. 32.)[9]

## III.    LEGAL STANDARD

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court

must determine whether the complaint contains "sufficient factual matter, accepted as true, to

state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(internal quotations omitted).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.*  "The plausibility standard is not akin to a probability requirement, but

it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal

quotations omitted).  In performing this analysis, the court accepts "the allegations in the

complaint as true, but [is] not compelled to accept unsupported conclusions and unwarranted

inferences, or a legal conclusion couched as a factual allegation."  *Castleberry v. STI Grp.*, 863

F.3d 259, 263 (3d Cir. 2017) (internal quotations omitted).

"As a general matter, a district court ruling on a motion to dismiss may not consider

matters extraneous to the pleadings."  *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410,

1426 (3d Cir. 1997).  But "an exception to the general rule is that a document *integral to or*

*explicitly relied* upon in the complaint may be considered without converting the motion to

dismiss into one for summary judgment."  *Id.* (cleaned up).  The court may also "consider

matters of public record, orders, exhibits attached to the complaint and items appearing in the

---

[9] On September 5, 2025, Pitts's current counsel filed a motion to withdraw.  (Doc. No. 38.)  As of the date of this Memorandum, however, the Court has not ruled on the motion.

record of the case." *Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011) (internal quotations omitted).

## IV.    DISCUSSION

Wallace brings several constitutional claims under 42 U.S.C. § 1983 and one claim for malicious prosecution under Pennsylvania law against the individual Defendants (Counts One through Five and Seven), as well as a derivative § 1983 claim for municipal liability against the City.  (*Id.* at 25–31.)

### A.    Legal Standard

As noted above, most of Wallace's claims are brought under § 1983.  That section provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  In a § 1983 action, the personal involvement of each individual defendant in the alleged constitutional violation is a required element, so a plaintiff must allege how each defendant was involved in the events and occurrences giving rise to the claims.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).

Local governments and municipalities, like the City of Philadelphia, are considered persons under § 1983 and may be sued directly under that section when "the action that is

alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. "[A] government entity may not be held vicariously liable under § 1983 for the acts of its employees under a respondeat superior theory of liability." *Winn & Sons, Inc.*, 162 F. Supp. 3d at 459 (citing *Monell*, 436 U.S. at 691). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694; *see also Mulholland v. County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013) ("When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." (quotation marks omitted)).

*     *     *

Wallace brings three claims for violation of his constitutional rights: malicious prosecution (Count One); fabricating evidence, withholding favorable evidence, and failing to conduct an adequate criminal investigation (Count Two); and violating his right against self-incrimination (Count Three). (Doc. No. 1 at 25–28, 31–32.) Wallace also brings two derivative claims against the individual Defendants, which are based on the underlying constitutional violations, one for conspiring to violate Wallace's rights (Count Four), and one for failing to intervene (Count Five). (*Id.* at 28–30.) Last, Wallace brings a derivative claim for municipal liability against the City of Philadelphia (Count Six). (*Id.* at 30–31.) Defendants argue all of Wallace's claims fail because he has not alleged a plausible violation of his constitutional rights. (Doc. No. 13 at 13–20; Doc. No. 25-2 at 10.) The Court considers Wallace's claims against the

12

individual Defendants (Counts One through Five) before turning to his claim for municipal liability (Count Six).

### B.    Claims Against the Individual Defendants

The Court considers whether Wallace has alleged a plausible violation of his constitutional rights before turning to his for conspiracy and failure to intervene.

### 1.    Claims for Malicious Prosecution (Count One)

In Count One, Wallace brings malicious prosecution claims against the individual Defendants under the Fourth and Fourteenth Amendments.  (Doc. No. 1 at 25–26.)  Typically, "[m]alicious prosecution claims are . . . brought under the Fourth Amendment."  *Capriotti v. Sadowski*, No. 4:21-cv-00308, 2024 WL 778414, at *2 n.1 (M.D. Pa. Feb. 26, 2024) (citing *Thompson v. Clark*, 596 U.S. 36, 42 (2022)).  Although district courts in this Circuit have recognized the possibility that "a malicious prosecution claim may be brought as a Fourteenth Amendment procedural due process claim," *id.* (internal quotations omitted), "the status of a Fourteenth Amendment right to be free from malicious prosecution is murky," *Crosland v. City of Philadelphia*, No. 22-cv-2416, 2023 WL 3898855, at *7 (E.D. Pa. June 8, 2023).  The Court ultimately need not decide this issue, however, because at the motion to dismiss stage, courts have evaluated malicious prosecution claims under the Fourth and Fourteenth Amendments through "the same framework—namely, the rubric of the Fourth Amendment."  *Oliver v. City of Philadelphia*, No. 25-cv-197, 2025 WL 1902298, at *3 (E.D. Pa. July 9, 2025).  The Court will do the same here.

Under this standard, Wallace must allege that:

> (1) [the government] initiated a criminal proceeding; (2) the criminal proceeding ended in the [Wallace's] favor [when his conviction was vacated]; (3) the proceeding was initiated without

> probable cause; (4) the [government employees] acted maliciously
> or for a purpose other than bringing [Wallace] to justice; and,
> (5) [Wallace] suffered a deprivation of liberty consistent with the
> concept of seizure as a consequence of a legal proceeding.

*Id.* (quoting *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005)).  Because "prosecutors, rather than police officers, are generally responsible for initiating criminal proceedings," a plaintiff asserting a malicious prosecution claim against an officer must demonstrate that the officer "knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion."  *Brockington v. City of Philadelphia*, 354 F. Supp. 3d 563, 569 (E.D. Pa. 2005) (quotation marks omitted); *see also Parker v. Gainey*, No. 2:23-cv-2102-NR, 2025 WL 2062563, at *7 (W.D. Pa. July 23, 2025) ("[P]olice officers can be held liable for malicious prosecution if they knowingly provide false information, omit information, or fail to provide exculpatory information to the prosecutor.").

Defendants argue that Wallace's malicious prosecution claims fail because Wallace has not alleged that his criminal proceeding was initiated without probable cause.  (Doc. No. 13 at 18–19; Doc. No. 25-2 at 12.)  Wallace counters that he states plausible malicious prosecution claims because he has alleged that Pitts coerced Taylor into making "false statements," which were later "used to support both the affidavit of probable cause" for Wallace's arrest warrant and his "eventual conviction."  (Doc. No. 14 at 10; Doc. No. 32 at 6.)

This argument fails for two reasons.  *First*, Wallace lacks specific factual allegations that Pitts—or any other individual Defendant—knowingly provided false information to prosecutors. To be sure, Wallace alleges that "[d]etectives brow beat Raffinee Taylor, taking three statements from her over the course of three days" and that Taylor later "denied making these statements, saying that she had been intimated and coerced by Detective Pitts."  (Doc. No. 1 at 11.)  Yet

14

Wallace fails to allege how Pitts coerced Taylor into making these false statements. In Wallace's Complaint, there are no allegations, for example, that Pitts used or threatened to use physical force against Taylor,[10] that Pitts unlawfully detained her, or that Pitts otherwise forced her to make a false statement. Although Walace alleges that Taylor "described, on the record, how she was coerced by Pitts," (*id.* at 15), he does not attach this "record" to his Complaint, and he does not make any *specific* allegations about how Pitts coerced Taylor into making false statements. In short, Wallace's theory that Pitts knowingly provided false information to prosecutors rests on conclusory assertions that Pitts coerced Taylor. Such conclusory assertions need not be accepted when, as here, the Complaint "has not supported [them] with enough alleged facts to plausibly suggest that [Pitts], in fact, coerced [Taylor]." *Handy v. City of Philadelphia (Handy II)*, No. 24-cv-1905, 2025 WL 2618956, at *2 (E.D. Pa. Sept. 10, 2025); *see also id.* ("[A] plaintiff's mere allegation of coercion, without more, is a legal conclusion that does not suffice at the motion to dismiss stage.") (collecting cases).

*Second*, Wallace has not alleged that prosecutors lacked probable cause to initiate a criminal proceeding against him without Taylor's statements. Although Wallace argues in his opposition briefs that Taylor's statements were "used to support . . . the affidavit of probable cause," (Doc. No. 14 at 10; Doc. No. 32 at 6), he does not make this allegation in his Complaint. In fact, his Complaint lacks any allegations about who filed the affidavit of probable cause or what information was included in it. Without more, the Court cannot assess whether the criminal proceeding initiated against Wallace lacked probable cause without Taylor's statements, which is

---

[10] Although Wallace alleges that Detectives "brow beat" Taylor, this term is imprecise and fails to specify the circumstances surrounding Pitts's alleged coercion of Taylor. *See Browbeat* (def. 1.a.), *Oxford English Dictionary* (2025) ("To bear down, discourage, or oppose, with stern, arrogant, or insolent looks or words; to snub, to bully").

a necessary element for his malicious prosecution claims. *See Handy II*, 2025 WL 2618956, at *2 (explaining that even if the detectives knew that plaintiff's confession was false, plaintiff "must still allege that there was no probable cause to initiate the proceeding without the confession").

Accordingly, Wallace's malicious prosecution claims (Count One) are dismissed.[11]  This dismissal is, however, without prejudice.  Wallace expressly requests leave to amend his claim (Doc. No. 32 at 8), and the Court finds that granting leave would not be futile because Wallace appears to have more allegations to make in support of these claims.

### 2.    Claims for Fabricating Evidence, Withholding Favorable Evidence, and Failing to Conduct an Adequate Criminal Investigation (Count Two)

In Count Two, Wallace brings three claims under the heading "42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation."  (Doc. No. 1 at 26.)  The Court understands Wallace to bring separate claims for (1) fabricating evidence, (2) withholding favorable evidence, and (3) failing to conduct an adequate criminal investigation.  The Court addresses each claim in turn.

---

[11] For this reason, the Court also dismisses Wallace's state law malicious prosecution claims (Count Seven) against the individual Defendants.  Under Pennsylvania law, malicious prosecution requires "(1) the institution of proceedings against the plaintiff without probable cause and with malice and (2) a showing that the proceedings were terminated in favor of the plaintiff."  *York v. Kanan*, 298 A.3d 533, 542 (Pa. Commw. Ct. 2023).  In other words, "[a] malicious prosecution claim under Pennsylvania law requires a plaintiff to show all but the fifth element" of a federal malicious prosecution claim.  *Thomas v. City of Philadelphia*, 290 F. Supp. 3d 371, 379 (E.D. Pa. 2018).  Because Wallace has not alleged that any individual Defendant provided false information to prosecutors or that his criminal proceeding lacked probable cause without Taylor's statements, Wallace's state law claims fail as well.

***Fabricating Evidence***.  Wallace brings fabrication of evidence claims against the individual Defendants based on:  (1) Pitts coercing Taylor into making false statements that were later introduced at Wallace's trial, and (2) Detectives Gillespie and Poulos's interviews with Wallace at the hospital while he was "under the influence of heavy pain medication."  (Doc. No. 14 at 6–7; Doc. No. 32 at 8–9.)  "If a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment."  *Mervilus v. Union County*, 73 F.4th 185, 193 (3d Cir. 2023) (quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014)) (cleaned up).  Coerced statements do not, however, necessarily constitute fabricated evidence.  *See Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) ("[C]oercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but . . . unlike falsified evidence and perjured testimony, [coerced testimony] may turn out to be true." (internal quotations omitted)); *Clark v. Abdallah*, No. 21-10001, 2023 WL 4852230, at *9 (E.D. Mich. July 28, 2023) ("[C]oercion alone, without more, cannot rise to the level of fabrication.").  Here, Wallace's claims fail because he has not alleged that the statements made by Taylor and himself—even if coerced—were fabricated.

As noted above, Wallace's Complaint contains only conclusory assertions that Pitts coerced Taylor into making false statements.  *See supra* Section IV.A.1.  Similarly, the Complaint contains only passing and conclusory references to a "fabricated confession" by Wallace.  (Doc. No. 1 at 26.)  Wallace clarifies in his brief opposing the City Defendants' motion to dismiss that the allegations "pertaining to Mr. Wallace's fabricated and coerced confession" are contained in the paragraphs describing his interviews at Einstein with Detectives Gillespie and Poulos.  (Doc. No. 14 at 6–7.)  Wallace claims that these interviews were coerced because

"Wallace was unable to give consent and unable to ask for an attorney" while on pain medications.  (*Id.*)  But these failures, even if true, do not show his statements were fabricated, and as noted above, his conclusory assertion that they were "fabricated" is not sufficient to survive a motion to dismiss.  *See Castleberry*, 863 F.3d at 263.  Wallace has not provided copies of the statements or described them in detail.  Nor has he denied making the statements or explained how they were false.  *See Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) ("[U]nlike falsified evidence and perjured testimony, [coerced testimony] may *turn out to be true*." (internal quotations omitted) (emphasis added)); *cf. Halsey*, 750 F.3d at 296 (reversing the district court's entry of summary judgment on the plaintiff's fabricated evidence claim based on the use of plaintiff's *false* confession at trial).

Accordingly, the Court dismisses Wallace's fabricated evidence claims.  As with his malicious prosecution claims, however, Wallace appears to have more factual allegations to make in support of these claims.  The Court thus dismisses them without prejudice.

***Withholding Favorable Evidence.***  Wallace also brings claims against the individual Defendants for deliberately suppressing exculpatory evidence.  (Doc. No. 32 at 10.)  The Court understands Wallace to be bringing § 1983 claims based on *Brady* violations.[12]  A *Brady* violation has three elements: "(1) the evidence at issue is favorable to the accused, because either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced

---

[12] The Court is mindful that the Third Circuit "has distinguished between a *Brady* claim—in which a plaintiff's due process rights are 'violated by the failure to disclose exculpatory or impeachment evidence to the defense'—and a claim for deliberate deception—which 'must go beyond the failure to disclose evidence and arises when imprisonment results from the knowing use of false testimony or other fabricated evidence or from concealing evidence to create false testimony to secure a conviction.'" *Gainey v. City of Philadelphia*, 704 F. Supp. 3d 589, 599 (E.D. Pa. 2023) (quoting *Dennis v. City of Philadelphia*, 19 F.4th 279, 291 (3d Cir. 2021)).  Here, Wallace appears to assert a *Brady* claim.

because the evidence was material." *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011) (internal quotations omitted). "Police officers may be liable under Section 1983 for a *Brady* violation when, for example, they fail to disclose exculpatory information to a prosecutor." *Handy v. City of Philadelphia* (*Handy I*), No. 24-cv-1905, 2024 WL 4309973, at *4 (E.D. Pa. Sept. 26, 2024) (citing *Gibson v. Superintendent of NJ Dep't of L. & Pub. Safety-Div. of State Police*, 411 F.3d 427, 443 (3d Cir. 2005)).

Defendants move to dismiss Wallace's claims for withholding favorable evidence because Wallace does not allege that the individual Defendants withheld any material or exculpatory evidence. (Doc. No. 13 at 16–17; Doc. No. 25-2 at 16–18.) According to Defendants, the closest Wallace comes to alleging that any exculpatory evidence was withheld are Wallace's allegations that "Duane Tate gave a statement that contradicted the information obtained by Officer Haman" and "[t]his discrepancy was concealed" from Wallace and his defense attorney. (Doc. No. 25-2 at 16–18; Doc. No. 13 at 16–17; *see also* Doc. No. 1 at 8.) As Defendants correctly argue, these allegations do not state a plausible § 1983 claim based on a *Brady* violation against any individual Defendant because Wallace does not specify the nature of Tate's contradictory statement, how the statement was favorable to Wallace, or how the individual Defendants were personally involved in concealing Tate's contradictory statement.

In response to Defendants' motions, Wallace does not attempt to defend his claim based on the concealment of Tate's contradictory statement. Instead, Wallace argues that he has stated a *Brady* claim against all the individual Defendants because "Defendant Pitts's history of misconduct was deliberately withheld" from Wallace. (Doc. No. 14 at 8; Doc. No. 32 at 12.) In other words, Wallace seeks to bring § 1983 claims premised on *Brady* violations against the

individual Defendants because Pitts and the other Detectives failed to disclose Pitts's history of misconduct. While creative, this argument fails for three reasons.

*First*, Wallace has not cited a single case where a court has ruled that a plaintiff can bring a § 1983 claim premised on a *Brady* violation against an officer for failing to disclose their own history of misconduct or another officer's history of misconduct in prior cases. True, district courts in other circuits have found that "[a]n officer's failure to disclose his or her own misconduct in investigating a case may give rise to a separate *Brady* claim against that officer." *Harris v. City of Los Angeles*, No. 2:21-cv-07999-WLH-JPR, 2024 WL 4719710, at *7 (C.D. Cal. Sept. 24, 2024). But Wallace's claim relies on Defendants' failure to disclose Pitts's "*history* of misconduct," *i.e.*, his misconduct in *other* cases. (Doc. No. 1 at 15 (emphasis added).)

*Second*, Wallace's current allegations do not establish that Pitts's "history of misconduct" was material to his conviction. At the outset, the Court notes that Wallace does not allege that Pitts testified at either his preliminary hearing or his trial. This fact is significant because although courts have found that "evidence that bears on the credibility of testifying officers—if they are key witnesses—constitutes potentially exculpatory evidence under *Giglio*," *Fraser v. City of New York*, No. 20-cv-04926 (CM), 2021 WL 1338795, at *7 (S.D.N.Y. Apr. 9, 2021), the same is not always true for non-testifying witnesses, *see United States v. Mahdi*, 999 F. Supp. 2d 236, 245 (D.D.C. 2013) ("Under *Brady* and *Giglio,* the prosecution is only required to disclose material evidence. As Tabron did not testify at Mahdi's trial, evidence that could have been used to impeach his testimony is not material." (internal quotations omitted)). Wallace impliedly concedes as much because he does not argue that if Pitts's history of misconduct had been

disclosed, there is a reasonable probability that the result of his trial would have been different.[13]

Instead, he argues that if he had Judge Sarmina's 2018 opinion in *Commonwealth v. Thorpe*

during his trial in 2012, the outcome would have been different because Taylor's statements

would not have been admitted as substantive evidence. (Doc. No. 1 at 15; Doc. No. 32 at 12.)

But Wallace brings claims against the individual Defendants for concealing Pitts's history of

misconduct, not for concealing Judge Sarmina's opinion.  As a reminder, Wallace's criminal trial

*predated* both Judge Sarmina's 2018 opinion in *Commonwealth v. Thorpe* as well as Pitts's 2024

convictions for perjury and obstruction of justice, meaning neither the opinion nor the conviction

could have been withheld by the individual Defendants in 2012.  (*See* Doc. No. 25-2 at 12 n.6.)

*Third*, Wallace does not allege that the individual Defendants concealed Pitts's history of

misconduct from the *prosecutor* overseeing his case.  Instead, Wallace alleges generally that this

information was "deliberately concealed prior to trial" without specifying who concealed the

information and from whom it was withheld.  *See Handy I*, 2024 WL 4309973, at *4 *Peterson v.*

*Pitts*, No. 18-cv-1691, 2019 WL 3836497, at *2 (E.D. Pa. Aug. 14, 2019) (dismissing "a § 1983

claim against Pitts for failing to inform the prosecutor of exculpatory information" because there

was no evidence that Pitts concealed material evidence from the prosecutor).[14]

---

[13] Tellingly, Wallace does not describe the scope of Pitts's "history of misconduct" or provide any allegations related to what the individual Defendants knew about any misconduct at the time of his trial in 2012.

[14] In addition to his arguments about Pitts's history of misconduct, Wallace states in passing that Defendants also "deliberately concealed the fact that Det. Jenkins had a close personal relationship with Miller." (Doc. No. 14 at 8.)  Wallace does not elaborate on this argument, and the Court finds it fails for the same reason as Wallace's arguments about Pitts's history of misconduct.  Specifically, Wallace has not alleged facts which would tend to show the relationship constitutes material evidence under *Brady*. The Complaint states in conclusory fashion that "[c]ross examination regarding this issue would have changed the outcome of Mr. Wallace's criminal trial." (Doc. No. 1 at 15–16.)  But Wallace has not explained why the outcome would have been different.  He does not describe the nature of Detective Jenkins relationship with Miller, the scope of Detective Jenkins's testimony during Wallace's criminal proceedings, or why this relationship would have undermined Detective Jenkins's testimony or

Because Wallace does not allege that the individual Defendants concealed material evidence from prosecutors, the Court finds that he has not plausibly alleged a § 1983 claim premised on a *Brady* violation. Accordingly, the Court dismisses his *Brady* claims without prejudice.

      ***Failing to Conduct an Adequate Investigation.*** Wallace's final bucket of claims under Count Two asserts that the individual Defendants failed to conduct an adequate investigation. (Doc. No. 1 at 26.) Defendants counter that there is no independent constitutional right to an adequate investigation. (Doc. No. 13 at 14 n.5.) Because "[c]ourts in this district have consistently held that there is no constitutional right to a police investigation," the Court agrees with Defendants. *See Handy II*, 2025 WL 2618956, at *4; *Lewis v. City of Philadelphia*, No. 19-cv-2847, 2020 WL 1683451, at *11 (E.D. Pa. Apr. 6, 2020) ("[N]umerous judges in this district have recognized that an inadequate police investigation does not independently violate any constitutional right."); *Thomas*, 290 F. Supp. 3d at 386 ("There is no constitutional right to a police investigation." (internal quotations omitted)). Unlike Wallace's previous claims, his adequate investigation claims cannot be cured with amendment. Accordingly, these claims are dismissed with prejudice.

### 3.    <u>Claims for Violating Wallace's Right Against Self-Incrimination (Count Three)</u>

      In Count Three, Wallace asserts the individual Defendants violated his Fifth Amendment right against self-incrimination. (Doc. No. 1 at 28.) "The Fifth Amendment, made applicable to

---

credibility. *Cf. Berry v. United States*, 2019 WL 6879349, at *5 (E.D.N.C. Dec. 17, 2019) ("In the instant case, [the defendant's] ex-fiancée being in a romantic relationship with [the arresting officer] is not material evidence."); *Morales-Machuca v. United States*, 2012 WL 642461, at *5–6 (D.P.R. Feb. 28, 2012) (dismissing the plaintiff's *Brady* claim premised on the government's failure to disclose friendship between a non-arresting officer and government witness).

the States by the Fourteenth Amendment, provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" *Ogrod v. City of Philadelphia*, 598 F. Supp. 3d 253, 269 (E.D. Pa. 2022) (quoting U.S. Const. amend. V). This means that "only voluntary concessions may be admitted at the trial of guilt or innocence." *Lego v. Twomey*, 404 U.S. 477, 478 (1972). "Whether a defendant's confession was voluntary is based on the totality of the circumstances of the interrogation, including any 'police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental health.'" *United States v. Wilson*, 2018 WL 1293114, at *6 (D. Del. Mar. 13, 2018) (quoting *United States v. Swint*, 15 F.3d 286, 288–89 (3d Cir. 1994)). Of these, the most crucial factor—and the one "necessary predicate for a finding of involuntariness"—is "coercive police activity." *Id.*

Wallace argues that he has stated a claims against the individual Defendants for violating his right against self-incrimination on two grounds: (1) Wallace was "coerced into giving two statements to the police[,] . . . without ever having been advised of his [*Miranda*] rights" and (2) Pitts "ordered Wallace's physicians to remove" bullet fragments from his hip. (Doc. No. 1 at 10–11.) The Court addresses each ground in turn.

***Wallace's Statements.*** First, Wallace claims that he was coerced into giving statements to Detectives Gillespie and Poulos without being advised of his rights and while "under heavy sedation." (Doc. No. 14 at 11; *see also* Doc. No. 1 at 10 (claiming he was "under the influence of heavy pain medication").) The City Defendants argue that this claim should be dismissed because even assuming the Detectives were required and failed to apprise Wallace of his *Miranda* rights when they visited him at Einstein, "a failure to provide the warnings to an individual required under the prophylactic rule set out by the Supreme Court in *Miranda v.*

23

*Arizona* does not give rise to a claim under 42 U.S.C. § 1983." (Doc. No. 13 at 19 (citing *Vega v. Tekoh*, 597 U.S. 134, 150 (2022)); *see also Vega*, 597 U.S. at 142 ("In this case, the Ninth Circuit held—and Tekoh now argues—that a violation of *Miranda* constitutes a violation of the Fifth Amendment right against compelled self-incrimination, but that is wrong. *Miranda* itself and our subsequent cases make clear that *Miranda* imposes a set of prophylactic rules. Those rules, to be sure, are 'constitutionally based,' but they are prophylactic rules nonetheless." (internal citations omitted)).

Wallace does not dispute this case law, and instead, argues that his allegations show something "different from the mere failure to provide *Miranda* warnings." (Doc. No. 14 at 11.) He asserts that he has sufficiently alleged that his statements were coerced and thus, involuntary, because Detectives Gillespie and Poulos interrogated him while he was impaired by the pain medications given to him at the hospital. (*Id.*) The Court agrees with Wallace that these allegations make this case something more than a mere failure to provide *Miranda* warnings. Courts have recognized that interrogation of a defendant while he is in the hospital—heavily medicated and recovering from a gunshot wound—can constitute "coercive police activity." *See Mincey*, 437 U.S. at 398 (finding criminal defendant's statements were not the product of "a rational intellect and a free will" when they were taken while he was at the hospital after the defendant had been shot and while he was in "unbearable" pain, medicated, and "encumbered by tubes, needles, and breathing apparatus"); *Wilson*, 2018 WL 1293114, at *6 ("Although there is no precise definition of 'coercive police activity,' the Supreme Court has identified the following examples as constituting such: interrogating the defendant for four hours while incapacitated and sedated in intensive care unit . . . ." (quotation marks omitted); *cf. Berghuis v. Thompkins*, 560 U.S. 370, 386–87 (2010) (finding no evidence that the defendant's statement was coerced and

emphasizing that the case lacked "facts indicating coercion, such as an incapacitated and sedated suspect").

That does not, however, necessarily mean that Wallace has alleged a plausible violation of his right against self-incrimination *by Detectives Gillespie and Poulos*.  The Third Circuit has cautioned that it is the "use of the [coerced] confession" at trial that violates a defendant's right against self-incrimination, and thus, the violation is necessarily "the work of the prosecutor," not the interrogating officer.  *See Yarris v. County of Delaware*, 465 F.3d 129, 139 (3d Cir. 2006) ("Yarris also alleges that the CID Detectives violated his constitutional rights by using trickery or deceit to obtain false evidence against him.  As noted, the introduction in evidence of the allegedly false testimony was the work of prosecutors—not the CID Detectives—and is covered by absolute prosecutorial immunity.  We perceive no support—and Yarris has identified no support—for the proposition that the use of impermissible interrogation techniques in securing statements prior to their use in court constituted an independent violation of Yarris's constitutional rights." (citations omitted)); *Bodle v. Linhardt*, No. 4:12-cv-02425, 2013 WL 2481250, at *7 (M.D. Pa. June 10, 2013) (finding the plaintiff failed to state a Fifth Amendment claim against the defendant officers because "the use of the confession [at trial] would have been the work of the prosecutor not [the] defendant[ officers]").

Accordingly, the Court finds Wallace's claims fail to the extent he argues that Detectives Gillespie and Poulos violated his right against self-incrimination.  Because this is not a deficiency that can be cured by amendment, these claims are dismissed with prejudice.

***Removal of Bullet Shards.***  Wallace next argues that Pitts violated his right against self-incrimination by ordering doctors to extract bullet fragments from his hip.  (Doc. No. 32 at 14.) Wallace alleges in his Complaint that the doctors "refused" Pitts's order, and they did not do the

surgery to extract the bullet fragments until Pitts "obtained a court order." (Doc. No. 1 at 11.) Wallace cites no authority to support his claim that the removal of bullet fragments from a person pursuant to a court order can constitute a violation of his constitutional right against self-incrimination. Even if the Court were to look past this issue, *see* L. Civ. R. 7.1(c), Wallace's claim still fails because "a violation of the constitutional right against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case," *Chavez v. Martinez*, 538 U.S. 760, 770 (2003). Here, Wallace alleges that "the ballistics evidence which Detective Pitts went to such destructive ends to retrieve was never used at trial." (Doc. No. 1 at 11.) So even setting aside the issue of whether the removal of a bullet fragment implicates a defendant's right against self-incrimination, Wallace's claim still fails because the evidence was not used during his trial. *See Bodle*, 2013 WL 2481250, at *7 (dismissing a § 1983 claim based on an alleged self-incrimination violation because plaintiff did not allege that his coerced confession was used at his trial). Because this is not a deficiency that can be cured by amendment, this claim is dismissed with prejudice.

*    *    *

In sum, the Court finds that Wallace has failed to plead a plausible claim for violation of his right against self-incrimination. Accordingly Count Three is dismissed with prejudice to the extent Wallace alleges that Detectives Gillespie and Poulos spoke with him while he was "under the influence of heavy pain medication" and that Pitts pursued removal of the bullet fragments from Wallace's body.

### 4.    Claim for Civil Rights Conspiracy (Count Four)

In Count Four, Wallace asserts a Section 1983 conspiracy claim against the individual Defendants. (Doc. No. 1 at 28–29.) The Court finds this claim fails for two reasons. *First*,

because Wallace has not alleged a constitutional violation, *see supra* Part IV.B.1–3, his

derivative claims for civil rights conspiracy also fail. *See Durham v. Dep't of Corr.*, 173 F.

App'x 154, 157 (3d Cir. 2006) (ruling that plaintiff did not state a plausible civil rights

conspiracy claim "because he has not shown an underlying constitutional injury"). *Second*, to

state a claim for civil conspiracy "a plaintiff must assert facts from which a conspiratorial

agreement can be inferred." *See Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615

F.3d 159, 178 (3d Cir. 2010). Wallace has not done so here. It is not enough for Wallace to

allege that "there was 'a corrupt conspiracy,' 'an agreement, or 'an understanding in place

between Defendants . . . .'" *Id.* (describing such statements as "conclusory allegations," which

are "not entitled to the assumption of truth" (quotation marks omitted)). Instead, he must allege

facts that suggest, for example, "the approximate time when the agreement was made, the

specific parties to the agreement . . . , the period of the conspiracy, or the object of the

conspiracy." *Id.* at 179. Because Wallace has failed to provide any factual allegations to suggest

the individual Defendants formed a conspiracy to deprive him of his constitutional rights, Count

Four fails for this alternative reason. Accordingly, Count Four is dismissed without prejudice

and with leave to amend.

### 5.    Claim for Failure to Intervene (Count Five)

In Count Five, Wallace asserts a failure-to-intervene claim against the individual

Defendants. (Doc. No. 1 at 29–30.) Wallace concedes that the Third Circuit has not recognized

failure-to-intervene claims outside of the "excessive force or [custodial] sexual assault" contexts.

*Thomas v. City of Harrisburg*, 88 F.4th 275, 285 (3d Cir. 2023); *see Parker*, 2025 WL 2062563,

at *9 ("District courts routinely dismiss failure-to-intervene claims that fall outside of the

excessive force or custodial sexual assault context."). Wallace nevertheless tries to save his

failure-to-intervene claims by arguing that the individual Defendants' failure to stop "the physical force used to remove ballistics evidence from [his] body" is analogous to a police officer's "failure to intervene in a beating."  (Doc. No. 32 at 16; *see also* Doc. No. 14 at 12.)[15]

Once more, the Court discerns at least three issues with Wallace's argument.  *First*, as with Wallace's conspiracy claims, Wallace's failure to intervene claims require that he allege that his "underlying constitutional rights were violated."  *Klein v. Madison*, 374 F. Supp. 3d 389, 419 (E.D. Pa. 2019) (quoting *Adams v. Selhorst*, 449 F. App'x 198, 204 (3d Cir. 2011)).  The Court has already found that Wallace failed to state a constitutional violation related to the removal of the bullets from his body; as such, he cannot make out a failure to intervene claim related to this conduct.  *Second*, to the extent that Wallace looks to maintain a failure to intervene claim against Pitts, the Complaint alleges that Pitts was the person responsible for "obtain[ing] a court order to have the bullet fragment removed from [his] hip."  (Doc. No. 1 at 11.)  Because Wallace alleges that Pitts was the person responsible for the alleged constitutional violation, he cannot assert a claim against Pitts for "failing to intervene to stop his . . . own unconstitutional actions."  *Parnell v. Jackson Township*, No. 21-cv-19326 (GC) (RLS), 2024 WL 2767896, at *8 (D.N.J. May 30, 2024) (collecting cases).  *Third*, as to the remaining individual Defendants, Wallace has not alleged that they knew Pitts was taking steps to have the bullets removed, such that they had the opportunity to intervene.  *See Smith v. Mensinger*, 293 F.3d 641, 651 (3d Cir.

---

[15] Wallace appears to concede that he cannot state a claim for failure-to-intervene based on any other conduct by the individual Defendants.  (*See* Doc. No. 14 at 12–13 (acknowledging that "failure to intervene has not been extended to non-violent acts, such as where a prosecutor fails to correct false information in an affidavit of probable cause, or even when there is fabrication of evidence" (citations omitted)).)

2002) ("[A]n officer is only liable if there is a realistic and reasonable opportunity to intervene.").

Because the Court previously dismissed Wallace's constitutional claim with prejudice to the extent he challenged the removal of the bullet fragments, it is also appropriate to dismiss Wallace's failure to intervene claim—which is derivative of the constitutional claim—with prejudice.

*      *      *

For those reasons, Wallace's § 1983 claims in Counts One, Two, Three, Four, and Five are dismissed in part with prejudice and in part without prejudice. Wallace's state law claims in Count Seven are also dismissed without prejudice.

### C.      Claims Against the City of Philadelphia

That leaves only Wallace's claim for municipal liability in Count Six. Because Wallace has failed to allege a plausible constitutional violation, the Court must find that he has also failed to state a claim for municipal liability against the City. *See Mulholland v. County of Berks*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) ("It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim.").[16] Nevertheless, because Wallace will have

---

[16] The Third Circuit has suggested that "an underlying constitutional tort can still exist even if no individual employee [of the municipality] violated the Constitution," so long as there is "a violation of the plaintiff's constitutional rights" (e.g., a substantive due process claim asserted solely against a municipality for its policies, procedures, or customs) for which the municipality may be independently liable). *Johnson v. City of Philadelphia*, 975 F.3d 394, 403 n.13 (3d Cir. 2020). But the state of that law is somewhat uncertain. *See id.* (declining to "wade into th[e] discussion" surrounding this issue). Because Wallace does not discuss this line of cases or otherwise argue that the City is independently liable for substantive due process violations, the Court does not discuss the issue further here. *See Hausknecht v. John Hancock Life Ins. Co. of N.Y.*, 614 F. Supp. 3d 168, 186 (E.D. Pa. 2022) ("In making an argument, a party must offer some argument or development of its theory, cite relevant precedents, and frame the issue for decision. This Court's role is not to craft arguments for the parties, especially those represented by counsel." (cleaned up)).

the opportunity to file an amended complaint, the Court discusses the City Defendants' argument in favor of dismissal of this claim.

As the Court explained above, *see supra* Part III, municipalities, like the City of Philadelphia, are considered persons under § 1983 and may be sued directly under that section when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. Courts have recognized two avenues to municipal liability under *Monell*. "A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (citations omitted). Wallace's Complaint appears to pursue both avenues. (*See* Doc. No. 1 at 30–31 (claiming Wallace's injuries were caused by City "practices, policies, and customs," as well as the City's failure to "implement sufficient training and/or any legitimate mechanisms for oversight or punishment").) But in his opposition to the City Defendants' motion to dismiss, he does not discuss his failure to train claim, arguing only that the "body of the Complaint contains extensive allegations regarding the pattern and practice whereby homicide detectives would conceal and fabricate evidence in order to secure convictions." (Doc. No. 14 at 13.) Accordingly, the Court focuses on whether Wallace has plausibly alleged a City of Philadelphia policy, practice or custom.[17]

---

[17] To the extent Wallace's allegations involve policies or practices of the Philadelphia District Attorney's Office, that office is a separate legal entity from the City of Philadelphia and is not a Defendant in this action, so its actions are irrelevant. (*See* Doc. No. 13 at 23 n.8.)

"[A] plaintiff presenting an unconstitutional policy must point to an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject." *Forrest*, 930 F.3d at 105. "And if alleging a custom, the plaintiff must evince a given course of conduct so well-settled and permanent as to virtually constitute law." *Id.* at 105–06. Wallace has not identified an "official proclamation, policy or edict," and as noted above, his opposition brief discusses only a City "pattern and practice" (Doc. No. 14 at 13), so the Court assumes that Wallace's claim rests on allegations of a municipal custom.

Here, Wallace identifies numerous practices within the Homicide Division of the Philadelphia Police Department, which he claims evidence a custom "of unconstitutional misconduct in homicide investigations, including the coercion of confessions and suggestion of false statements from witnesses, and the suppression of exculpatory and inconsistent evidence." (Doc. No. 1 at 16.) Wallace then discusses each of these alleged practices in more detail (*id.* at 16–19), before identifying ten criminal cases, which he alleges "demonstrate that this misconduct was pervasive within the City of Philadelphia in [ ] the Police Department . . . both before and after it investigated and prosecuted Mr. Wallace" (*id.* at 19–21). Indeed, many of the referenced cases are specific to the Homicide Division (and in some instances, former Detective Pitts) and/or describe detectives coercing witnesses to provide false statements, fabricating confessions, and withholding material evidence. (*Id.* at 20–21.) For example, Wallace alleges that the criminal defendant in one such case was exonerated because the investigation involved "the fabrication and coercion of witness statements, garnering of false identifications based on

31

suggestive police behavior, the suppression of exculpatory evidence and the submission of untruthful affidavits of probable cause when seeking arrest warrants." (*Id.* at 20.)[18]

These allegations are sufficient at the pleadings stage. *See Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990) ("[T]o sustain a § 1983 action against the City, plaintiffs must simply establish a municipal custom coupled with causation—i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury."); *Doe, L.S. v. City of Philadelphia*, No. 23-cv-0342, 2023 WL 5246307, at *13–15 (E.D. Pa. Aug. 15, 2023) (finding "Plaintiff's allegations sufficiently state a claim for municipal liability based on an unconstitutional custom" where the plaintiff identified multiple cases involving other homicide detectives' similar misconduct); *Gorman v. Warwick Township*, Civil Action No. 10–cv–6760, 2011 WL 1235198, at *6 (E.D. Pa. Apr. 1, 2011) ("While proof of a single incident of unconstitutional activity may not be sufficient, in and of itself, to establish liability under *Monell*, if a municipal entity can be shown to have tolerated known misconduct by police officers in the past or that its policymakers were aware of similar unlawful conduct in the past but failed to take precautions against future violations and that this failure at least in part caused the injury complained of, it may be liable."); *cf. Johnson v. City of Paterson*, No. 21-cv-19907 (EP) (JSA), 2022 WL 16570649, at *4–5

_____

[18] Wallace also alleges that during the relevant period, the Philadelphia Police Department was subject to consent decrees and injunctions because of its inadequate policies and procedures. (Doc. No. 1 at 22.) Those court orders appear to involve issues of racial profiling as opposed to the conduct that Wallace claims resulted in violation of his constitutional rights. (*See, e.g.*, *id.* (identifying one order "enjoining police sweeps of Latinos in the Spring Garden neighborhood"); *id.* (identifying another order "enjoining unconstitutional stops, detentions and searches of Black men during the 'Center City Stalker' investigation).) The Court need not decide, however, whether the consent decrees and injunctions could support a custom of unconstitutional conduct in Wallace's case because the Court finds that Wallace has sufficiently alleged a municipal custom even if those allegations are disregarded.

(D.N.J. Nov. 1, 2022) (finding that the plaintiff "sufficiently pleaded a claim for an unconstitutional custom" where she "specifically alleged that Officer Qirjak swung her into a wall and bench while she was in handcuffs at the police station," that "several officers witnessed the incident and refused to intervene," and that the police department's internal affairs division found an officer acted wrongfully in one of the 93 excessive force complaints filed with the City between 2015 and 2019).

Accordingly, the Court rejects the City's alternative argument that Wallace's municipal liability claim against it should be dismissed for failure to satisfy the requirements set forth in *Monell* and *Forrest*. Nevertheless, Count Six is dismissed without prejudice because Wallace has failed to allege a plausible constitutional violation.

## V.    CONCLUSION

For the reasons above, the Court grants Defendants' motions to dismiss in part with prejudice and in part without prejudice. Wallace will be given an opportunity to file an amended complaint. An appropriate Order follows.